UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Julie Motuzas

     v.

Civil No. 20-cv-327-LM
Opinion No. 2021 DNH 131 P

Andrew Saul, Commissioner,
U.S. Social Security Administration

**O R D E R**

Pursuant to 42 U.S.C. § 405(g), Julie Motuzas seeks judicial review of the

decision of the Commissioner of the Social Security Administration denying her

application for disability insurance benefits ("DIB"). Motuzas moves to reverse the

Commissioner's decision, contending that the Administrative Law Judge ("ALJ")

erred in two ways: (1) by failing to consider fully whether Motuzas' impairments

meet or equal one of the impairments listed in Part A of Appendix 1 to Part 404,

Subpart P of Title 20 of the Code of Federal Regulations, and (2) by assigning

improper weight to the medical opinions in the record. The Administration moves

to affirm. For the reasons discussed below, the decision of the Commissioner is

vacated, and this case is remanded to the Administration for further consideration.

**STANDARD OF REVIEW**

In reviewing the final decision of the Commissioner under Section 405(g), the

court "is limited to determining whether the ALJ deployed the proper legal

standards and found facts upon the proper quantum of evidence." Nguyen v.

Chater, 172 F.3d 31, 35 (1st Cir. 1999); accord Seavey v. Barnhart, 276 F.3d 1, 9

(1st Cir. 2001).  The court defers to the ALJ's factual findings as long as they are supported by substantial evidence.  42 U.S.C. § 405(g); see also Fischer v. Colvin, 831 F.3d 31, 34 (1st Cir. 2016).  "Substantial-evidence review is more deferential than it might sound to the lay ear: though certainly 'more than a scintilla' of evidence is required to meet the benchmark, a preponderance of evidence is not." Purdy v. Berryhill, 887 F.3d 7, 13 (1st Cir. 2018) (citation omitted).  Rather, the court "must uphold the Commissioner's findings if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support her conclusion."  Id. (citation and internal modifications omitted).

## DISABILITY ANALYSIS FRAMEWORK

To establish disability for purposes of the Social Security Act (the "Act"), a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Commissioner has established a five-step sequential process for determining whether a claimant has made the requisite demonstration.  20 C.F.R. § 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).  The claimant "has the burden of production and proof at the first four steps of the process."  Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001).  The first three steps are: (1) determining whether the claimant is engaged in substantial gainful activity; (2) determining whether she has a severe impairment; and

(3) determining whether the impairment meets or equals a listed impairment.  20 C.F.R. § 404.1520(a)(4)(i)-(iii).

If the claimant meets her burden at the first two steps of the sequential analysis, but not at the third, an ALJ assesses the claimant's residual functional capacity ("RFC"), which is a determination of the most a person can do in a work setting despite the limitations caused by her impairments.  Id. §§ 404.1520(e), 404.1545(a)(1); see also S.S.R. No. 96-8p, 1996 WL 374184 (S.S.A. July 2, 1996).  At the fourth step of the sequential analysis, the ALJ considers the claimant's RFC in light of her past relevant work.  Id. § 404.1520(a)(4)(iv).  If the claimant can perform her past relevant work, the ALJ will find that the claimant is not disabled.  See id. If the claimant cannot perform her past relevant work, the ALJ proceeds to the fifth step, at which it is the Administration's burden to show that jobs exist in the economy which the claimant can do in light of her RFC.  See id. § 404.1520(a)(4)(v).

**PROCEDURAL HISTORY**

On August 29, 2013, prior to filing the disability insurance benefits application at issue in this case, Motuzas filed a Title II disability insurance benefits application.  The Administration denied that application on March 14, 2014.  Motuzas requested a hearing to review the denial of her application but withdrew the request before the hearing took place.  Accordingly, on August 11, 2015, the Administration dismissed her claim.  Proceedings in connection with Motuzas's August 2013 application have not been reopened, and Motuzas did not

timely request that the dismissal be vacated.  As a result, the Administration's dismissal order of August 11, 2015 constitutes a final and binding determination that Motuzas was not disabled for purposes of the Social Security Act (the "Act"). See 20 C.F.R. §§ 404.959, 404.960; see also Hearings, Appeals, and Litigation Law Manual I-3-3-15C.

Motuzas filed the application for disability insurance benefits at issue in this case on August 25, 2015, alleging disability due to residual effects from a stroke, migraine headaches, anxiety, post-traumatic stress disorder, depression, left-side paresthesia, sleep apnea, insomnia, obesity, chronic fatigue, and prediabetes. Motuzas alleged that these conditions became disabling as of August 5, 2013. However, because the Administration's August 11, 2015 order dismissing Motuzas's August 2013 disability insurance benefits application is final and binding, the earliest allowable disability onset date in connection with Motuzas's current application is August 12, 2015.  Motuzas met the insured status requirements of the Act through December 31, 2016.

After the Administration denied Motuzas's application on December 28, 2015, Motuzas requested a hearing before an ALJ.  The ALJ held an initial hearing on February 1, 2017 and a second hearing on May 1, 2017.  Motuzas testified at both hearings and impartial vocational expert Dennis J. King testified at the second hearing.  The ALJ issued an unfavorable decision on August 9, 2017.  Motuzas appealed the ALJ's decision and on January 22, 2019 the Appeals Council granted her appeal, vacated the decision, and remanded the case for a new hearing.

Accordingly, a third hearing was held before the ALJ on June 24, 2019.  Motuzas testified at the third hearing, as did impartial vocational expert James L. Soldner. The ALJ issued a further unfavorable decision on September 26, 2019.

The ALJ found in support of his September 2019 decision that Motuzas had a combination of severe impairments consisting of late effects of cerebrovascular disease, obesity, and affective disorder.[1]  He further found that Motuzas's combination of impairments did not meet or equal the severity of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  In assessing whether Motuzas's combination of impairments met or equaled Listing 11.04 (vascular insult to the brain), the ALJ considered whether Motuzas's impairments met or equaled the criteria set forth at Listing 11.04A and 11.04B, but did not expressly consider the criterial set forth at Listing 11.04C.

The ALJ found that, during the period between August 12, 2015 (the earliest allowable disability onset date in connection with Motuzas's current application) and December 31, 2016 (the date Motuzas was last insured for purposes of the Act):

---

[1]  The ALJ found that Motuzas's other medical conditions of record, specifically sleep apnea, insomnia, migraine headaches, and prediabetes mellitus, did not cause or contribute to any severe impairments in Motuzas's functional capacities.  The ALJ nevertheless considered Motuzas's non-severe impairments caused by those conditions in determining Motuzas's residual functional capacity. The ALJ did not, however, address Motuzas's complained-of conditions of anxiety or post-traumatic stress disorder in his assessment of Motuzas's residual functional capacity; Motuzas notes but does not assign error to that omission.  The court's review of Motuzas's medical records does not indicate that Motuzas's anxiety or post-traumatic stress disorder caused medically determinable functional limitations in her ability to work during the period between August 12, 2015 and December 31, 2016 that could be expected to last at least 12 continuous months.  Accordingly, the court does not find that the ALJ erred by not addressing Motuzas's complained-of conditions of anxiety or post-traumatic stress disorder.  See 20 C.F.R. § 404.1509.

> [Motuzas] had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b). [She] has unlimited use of her upper extremities to push and pull. [She] can occasionally operate foot controls with the left lower extremity. [She] should never climb ladders, scaffolding or ropes. [She] can frequently stoop and occasionally climb stairs and ramps, bend, balance, kneel, crouch and crawl. [She] should avoid concentrated exposure to vibration and even moderate exposure to unprotected heights and moving mechanical parts. [She] is limited to understanding, remembering and carrying out one to three step instructions and has the ability to sustain those instructions during typical two-hour periods over an eight hour workday and forty-hour work week.

Admin. Rec. at 38-39. In assessing Motuzas's RFC, the ALJ accorded "limited weight" to the opinions of treating neurologist Khawaja Rahman, M.D., examining psychologist Sherie Friedrich, Psy.D., treating nurse Sara Shipley, A.P.R.N., and treating social worker Colleen Mahoney, L.I.C.S.W. He accorded "substantial weight" to the opinions of agency consulting physician Phyllis Standell, M.D., and agency consulting psychologist Craig Stenslie, Ph.D.

In response to hypothetical questions posed by the ALJ, impartial vocational expert King opined at the second hearing that a person with Motuzas's age, education, past work experience, and RFC could perform Motuzas's past relevant work as a retail cashier. Vocational expert King further opined that such an individual could additionally perform the job duties of a survey worker, an information clerk, and a school bus monitor. At the third hearing, impartial vocational expert Soldner opined in response to hypothetical questions posed by Motuzas's counsel that a person with Motuzas's RFC who, in addition, was unable to maintain concentration or complete tasks would not be able to perform the duties of any job existing in significant numbers in the national economy. Based in part on

6

King's testimony, the ALJ found at Step Five of the sequential process that Motuzas had not been disabled for purposes of the Social Security Act at any time between her earliest allowable disability onset date of August 12, 2015 and her date last insured of December 31, 2016.

On January 15, 2020, the Appeals Council denied Motuzas's request for review. As a result, the ALJ's September 26, 2019 decision became the Administration's final order for purposes of judicial review. 20 C.F.R. § 422.210(a); see also, e.g., Sims v. Apfel, 530 U.S. 103, 107 (2000). This action followed.

## DISCUSSION

Motuzas argues that remand is warranted because the ALJ failed to address the criteria set forth at Listing 11.04C in considering whether Motuzas's combination of impairments met or equaled the severity of Listing 11.04 (vascular insult to the brain). Motuzas further argues that the ALJ erred in according greater weight to the opinions of agency consulting physician Standell and agency consulting psychologist Stenslie than to those of treating neurologist Rahman, examining psychologist Friedrich, treating nurse Shipley, and treating social worker Mahoney. The court addresses these arguments below.

I.    Background

A detailed recital of Motuzas's medical history may be found in Motuzas's statement of material facts (doc. no. 9-2) as supplemented by the Commissioner's statement of material facts (doc. no. 13) and in the transcript of the administrative

record (doc. no. 6).  The court provides only a summary of the material medical

history and other material background information here.


A.    Work History

Prior to her alleged disability onset date, Motuzas worked as a retail cashier

and as a child-care provider.  Admin. Rec. at 83-84.  She most recently worked in

May 2011, at which time her employer laid her off from a child-care provider

position.  Id. at 84-85.


B.    Motuzas's Material Medical History Prior to Her Earliest Allowable
      Disability Onset Date

On August 5, 2013, Motuzas suffered a serious stroke, specifically a large

right-side middle cerebral artery infarction.  Id. at 607-11.  After her stroke,

Motuzas experienced weakness in her left-side extremities.  Id. at 607-11, 818.  She

was also diagnosed with anemia and morbid obesity.  Id. at 606-08.  In addition, in

the months immediately following her stroke, Motuzas experienced migraine

headaches with significantly greater frequency and of significantly greater intensity

than she had before the stroke.  Id. at 952-55, 957-62.  From August to November

2013, Motuzas underwent physical and occupational therapy to remediate her left-

side weakness.  Id. at 810-1133.

On December 6, 2013, Motuzas reported symptoms of numbness and tingling

in her left-side extremities (paresthesia) to Nurse Shipley.  Id. at 922-24.  Motuzas

also told Nurse Shipley that she was "discouraged with everything." Id. at 924.  On

8

a follow-up visit of January 9, 2014, Nurse Shipley observed continuing weakness in Motuzas's left extremities.  Id. at 918-21.

Motuzas began consulting with Dr. Rahman in connection with her migraine headaches on January 13, 2014.  Id. at 1152-54.  She reported to Dr. Rahman that before her stroke she had experienced migraine headaches approximately two to three times per year, whereas since her stroke she was experiencing migraines several times per week.  Id. at 1152.  Dr. Rahman prescribed the migraine medication Topiramate and scheduled Motuzas for follow-up in approximately three months.  Id.

On January 22, 2014, Motuzas went to the emergency room complaining of depression and reporting that for the past month she had been hearing voices urging her to hurt people.  Id. at 594-96.  Also on January 22, 2014, Motuzas presented for an examination by consultative psychologist Friedrich, at which she likewise reported hearing such voices.  Id. at 1822-23, 1824.  The record does not contain any additional reference to these or other auditory hallucinations, and no indication that any such psychiatric symptoms persisted further.

At the January 22, 2014 consultation with Dr. Friedrich, Motuzas presented with "fair" grooming and hygiene, appropriate eye contact, and affect ranging from flat to normal.  Id. at 1822.  Dr. Friedrich noted that Motuzas was "morbidly obese." Id.  Following her examination, Dr. Friedrich opined that Motuzas's intelligence was within the average range, that she was able to adequately perform activities of daily living, that she was able to interact appropriately with others, and that she

was able to understand "locations and work-like procedures and follow through with simple instructions" with "no evidence to suggest she is unable to remember detailed instructions." Id. at 1822-26. However, Dr. Friedrich opined, on the basis of Motuzas's inability to "go beyond the first in serial sevens" (i.e., a clinical test for measurement of intellectual impairment), that Motuzas was "unable to maintain concentration and complete tasks." Id. at 1826. In addition, Dr. Friedrich opined that Motuzas was "unable to tolerate stressors common to a work setting" because she "responds to stress in maladaptive ways." Id.

Motuzas began consulting with Social Worker Mahoney in connection with her depression and related mental health issues on February 14, 2014. Id. at 798-801. Social Worker Mahoney recorded that Motuzas presented with good hygiene, normal motor activity, and logical thought processes, but with poor eye contact and moderate anxiety. Id at 799. Social Worker Mahoney opined that Motuzas suffered from "moderate to severe depression with poor coping skills." Id. at 800. Motuzas thereafter continued seeing Social Worker Mahoney for therapy approximately once or twice monthly through at least May 2019. Id. at 716-809, 1308-17, 1662-1756, 1757-1821.

At a follow-up appointment with Dr. Rahman of March 25, 2014, Motuzas reported that the frequency of her migraines had declined to approximately 2-3 per month. Id. at 1155. Dr. Rahman nevertheless increased Motuzas's Topiramate prescription and added a further prescription for the headache medication Fioricet. Id. at 1156.

10

Motuzas consulted with Nurse Shipley on March 28, 2014 complaining "mainly" of depression. Id. at 95. Nurse Shipley recorded normal mental status findings. Id. at 906.

At a follow-up appointment of April 22, 2014 with Dr. Rahman, Motuzas reported only one migraine in the previous month. Id. at 1158.

Motuzas saw Nurse Shipley for a follow up appointment on April 30, 2014. Id. at 898-902. She reported feeling significantly less depressed. Id. at 899. Nurse Shipley reported a depression screen score of zero, id. at 900, as well as normal mood, affect, attention span, and concentration, id. at 901.

At a follow-up appointment of June 19, 2014 with Dr. Rahman, Motuzas reported having experienced dizziness with a mild headache approximately one week previously, but no other migraine symptoms since her last visit. Id. at 1161-62. On September 22, 2014, she reported no recurrence of dizziness or any other migraine symptoms. Id. at 1164-65. However, Motuzas experienced significant migraine headaches in October 2014, id. at 1166, and in December 2014, id. at 750.

On March 16, 2015, Motuzas reported to Dr. Rahman that she had not had a migraine headache since 2014. Id. at 1177. Following a physical examination, Dr. Rahman noted that Motuzas had full strength in all four of her extremities and that her gait and station were stable without ataxia. Id. at 1178. Dr. Rahman noted that Motuzas's Body Mass Index ("BMI") was 55.07.[2] Id.

-------

[2] According to the Centers for Disease Control, a BMI of 30.0 or higher constitutes obesity, and a BMI of 40.0 or higher constitutes "Class 3" or "severe" obesity, the most serious category of obesity. See Defining Adult Overweight &

On March 20, 2015, she reported to Nurse Shipley that she was feeling less depressed but that she was having trouble with concentration and memory.  Id. at 868.

Social Worker Mahoney filled out a "Mental Impairment — Medical Source Statement" form provided to her by Motuzas's counsel on August 6, 2015.  Id. at 599-602.  Social Worker Mahoney indicated on the form that Motuzas suffered from depression and anxiety, id. at 599, but also specifically opined that Motuzas was "unable to work because of physical condition, not because of mental health reasons," id. at 602.

C.    Motuzas's Material Medical History Between Her Earliest Allowable Disability Onset Date and Her Date Last Insured

As noted, Motuzas's earliest allowable disability onset date was August 12, 2015.

On September 1, 2015, Motuzas reported to Social Worker Mahoney that things had been better for her "lately," although she was still anxious about her family's finances.  Id. at 716.

On September 15, 2015, Motuzas reported to Dr. Rahman that she had not experienced any migraine symptoms since her last appointment on March 16, 2015, and that since that time she had experienced only "occasional and mild" headache symptoms.  Id. at 1174.  Dr. Rahman assessed her strength in all four extremities at

─────────────────

Obesity (Aug. 11, 2021), https://www.cdc.gov/obesity/adult/ defining.html.
Motuzas's BMI of 55.07 thus reflected severe obesity.

"5/5" and observed that her gait and station were stable without ataxia.  Id. at 1175.
He also noted that her BMI was 56.9.  Id. at 1174.

On September 22, 2015, Motuzas reported an intense migraine headache of
three days' duration.  Id. at 1172-73.  Dr. Rahman performed an occipital nerve
block to ease Motuzas's pain symptoms, id., but the pain returned within hours and
Motuzas went to the emergency room for headache treatment, id. at 1100-01.
Physicians at the emergency room noted that her 2013 stroke had "left the left side
of her body weak," but that "she can use it," id. at 1100, and more specifically that
"[h]er left arm and left leg are weak as compared to her right, but she can lift them
off the cart without problems," id. at 1101.  The physicians also noted that Motuzas
was "significantly obese."  Id. at 1100.  The ER physicians performed a
neurodiagnostic study that revealed no evidence of peripheral/entrapment
neuropathy or radiculopathy.  Id. at 1119.

On September 29, 2015, Motuzas reported a recurrence of her migraine
symptoms to a nurse.  Id. at 1221-26.

On October 2, 2015, Motuzas reported to Social Worker Mahoney that she
had been experiencing migraines for two weeks.  Id. at 1815.  On October 28, 2015,
Motuzas reported to Social Worker Mahoney that she had been experiencing
unspecified problems with her memory.  Id. at 1812.

Motuzas was examined by Dr. Friedrich a second time on November 16, 2015.
Id. at 1137-41.  Dr. Friedrich did not record any reference to auditory hallucinations
or other psychiatrically troubling symptoms.  Id.  Dr. Friedrich's report from the

November 2015 examination was otherwise largely similar to her report from the February 2014 examination.  Id.

Motuzas consulted with internist Ritamarie Moscola, M.D., on November 20, 2015.  Id. at 1143-46.  Motuzas reported left arm and leg pain since her stroke which she rated as "10/10 on most days and 8/10 on a good day."  Id. at 1143.  Dr. Moscola recorded that Motuzas displayed "no apparent distress" despite the high pain rating in her left extremities.  Id. at 1144.  Moscola found no signs of scoliosis, intact upper extremity deep tendon reflexes, normal grip strength on the right side, normal stance when standing, normal gait when walking, and normal capacity to maintain balance with closed eyes.  Id. at 1144-45.  However, she found that Motuzas's left-side grip strength was "limited due to pain" and she was unable to elicit a deep tendon reflex in Motuzas's lower extremities.  Id.  She diagnosed Motuzas with late effects of stroke, headache, chronic pain, anemia, and depression. Id. at 1145.

On December 23, 2015, agency consulting physician Standell and agency consulting psychologist Stenslie reviewed those of Motuzas's medical records that had at that time been submitted in support of Motuzas's application for DIB.  Those records included all of those discussed above, other than Dr. Friedrich's report from her February 2014 examination of Motuzas, Social Worker Mahoney's therapy notes from October 2015, and Dr. Rahman's treatment notes dated after September 14, 2015.  Those latter records, together with the records discussed below, were added to the record after the agency consultants' review was complete.

Following review of the then-available medical records, Dr. Sandell opined
that Motuzas suffered from severe impairments in connection with the effects of her
stroke and her obesity, but only non-severe impairments in connection with her
migraine headaches.  Id. at 125.  With respect to Motuzas's migraine headaches, Dr.
Sandell specifically opined that they were "occasional."  Id.  Dr. Sandell opined that
Motuzas had the physical residual functional capacity to occasionally lift or carry 20
pounds, to frequently lift or carry ten pounds, to stand, walk, or sit for six hours of
an eight-hour work day, to bend at the waist frequently, and to climb stairs,
balance, stoop, kneel, crouch, or crawl occasionally, except that she was limited in
her left lower extremity in her ability to operate foot controls, should never climb
ladders, and should avoid concentrated exposure to vibration or even moderate
exposure to heights.  Id. at 126-28.  With regard to Motuzas's mental residual
functional capacity, Dr. Stenslie opined that Motuzas had moderate limitations in
her ability to carry out detailed instructions but was not otherwise significantly
limited.  Id. at 128-30.

Nurse Shipley filled out a "Physical Medical Source Statement" form
provided by Motuzas's counsel on March 3, 2016.  Id. at 1147-50.  Through the form,
Nurse Shipley opined that Motuzas suffered from left-side weakness, pain, and
anxiety, and that her prognosis was "fair/good."  Id. at 1147.  Nurse Shipley
indicated through the form that Motuzas could sit for no more than 15 continuous
minutes and could stand for no more than 20 continuous minutes, that she could sit
or stand for no more than two total hours during an 8-hour working day, and that

she needed to walk for ten minutes of every hour.  Id. at 1148.  She further opined that Motuzas would need two to three 15-20 minute breaks per working day due to muscle weakness and pain symptoms.  Id.  She opined that Motuzas could only rarely lift an object weighing 10 pounds, and that she should never climb ladders and rarely stoop, squat, or climb stairs.  Id. at 1149.  Nurse Shipley indicated that Motuzas could use her right arm and hand to grasp, reach, and manipulate for 80% of a work day but her left arm for only 5-10% of a work day.  Id.  Finally, she opined that Motuzas would likely be "off task" 25% or more of a work day, that she was capable of only low stress work, and that she would likely need to be absent from work around three days per month.  Id. at 1150.

On March 14, 2016, Motuzas reported to Dr. Rahman that the frequency of her migraines had increased over the past three months to twice weekly.  Id. at 1168.  As previously, Dr. Rahman found that Motuzas had full strength in all four extremities and observed that her gait and station were stable without ataxia.  Id. at 1169.  Dr. Rahman once again increased Motuzas's Topiramate prescription.  Id.

On March 21, 2016, Dr. Rahman filled out a "Physical Medical Source Statement" form provided by Motuzas's counsel.  Id. at 1180-84.  Dr. Rahman's opinion was substantially similar to Nurse Shipley's.  Through the form, Dr. Rahman opined that Moutzas suffered from migraines without aura, and that her prognosis was "fair."  Id. at 1180.  He opined that she could neither sit nor stand for more than 30 continuous minutes without needing to change positions, that she could sit or stand for no more than two total hours during an 8-hour working day,

and that she needed to walk for ten minutes of every hour.  Id. at 1181.  He further opined that she would need frequent breaks due to chronic fatigue and pain symptoms.  Id.  He opined that she could only occasionally lift an object weighing less than 10 pounds, and that she should never twist, stoop, squat, or climb stairs or ladders.  Id. at 1182.  He opined that she would likely be "off task" 25% or more of a work day, that she was incapable of even low stress work, and that she would likely need to be absent from work more than four days per month.  Id. at 1183.

Dr. Rahman saw Motuzas again on June 13, 2016.  Id. 1193-95.  At that time she reported that she was experiencing one headache per week.  Id. at 1193.

On July 28, 2016, Motuzas reported to Nurse Shipley that she had recently quit drinking alcohol, and that until approximately two weeks prior she had been drinking four or five 24 oz. beers daily.  Id. at 1239.  Nurse Shipley opined that quitting alcohol had already made a positive difference in Motuzas's reported symptoms of paresthesia.  Id. at 1240.  Nurse Shipley recorded that Motuzas presented as "alert and cooperative; normal mood and affect; normal attention span and concentration."  Id.

On August 11, 2016, Motuzas reported to Social Worker Mahoney that she had gone without pain medication for a month, and that her attitude and family relationships were improved.  Id. at 1773.

Motuzas consulted with Nurse Shipley again on September 7, 2016.  Id. at 1248-51.  At that time, she reported that her headaches had improved, that she had no concerns and that she was "overall . . . feeling much better."  Id. at 1248.  Nurse

Shipley opined that Motuzas's anxiety and depression were stable on her current medications.  Id.

On October 7, 2016, Motuzas reported continued improvement in attitude, emotional regulation, and family relationships to Social Worker Mahoney.  Id. at 1766.  She further reported pride in "her ability to manage stressful situations."  Id. Social Worker Mahoney shifted the focus of her sessions with Motuzas from avoiding relapse to "maintaining gains."  Id.

On December 19, 2016, Dr. Rahman filled out a second "Physical Medical Source Statement" form provided by Motuzas's counsel.  Id. at 1253-57.  Dr. Rahman's opinion as expressed through the form dated December 19, 2016 was identical to that expressed through the form dated March 21, 2016, except that in December 2016 Dr. Rahman did not opine that Motuzas would need to take breaks due to symptoms of chronic fatigue.  Id.

On December 22, 2016, Social Worker Mahoney filled out a second "Mental Impairment — Medical Source Statement" form provided to her by Motuzas's counsel.  Id. at 1267-70.  Social Worker Mahoney indicated on the form that Motuzas suffered from anxiety, alcoholism, and depression, id. at 1267, but also indicated that Motuzas's alcoholism was "not currently an issue" as she had been "sober for months," id. at 1269.  Social Worker Mahoney opined that Motuzas was limited "most of the time on a sustained basis" in maintaining social functioning, tolerating stresses common to a work setting, maintaining attendance and schedule, interacting appropriately with the general public, accepting instruction and

18

responding to criticism, completing a normal work day or week without interruptions due to psychological symptoms, and performing at a consistent pace. Id. at 1269.  She further opined that Motuzas was limited "a third or more of the time" in concentration.  Id.

As noted, Motuzas's date last insured was December 31, 2016.

D.      Motuzas's Material Medical History Subsequent to Her Date Last Insured

On January 13, 2017, Motuzas reported to Dr. Rahman that she was experiencing headaches approximately twice per week.  Id. at 1319-21.  Dr. Rahman again increased Motuzas's Topiramate prescription.  Id.

On March 3, 2017, Motuzas reported to Social Worker Mahoney that she was free of stress and that she had learned to pace herself "to avoid becoming overwhelmed or increasing pain and fatigue."  Id. at 1315.  Social Worker Mahoney opined that Motuzas's therapy goals had been achieved, and on that basis terminated their sessions.  Id.

Notwithstanding the foregoing, Motuzas returned to Social Worker Mahoney for further therapy the following month.  Id. at 1671-73.  On April 14, 2017, Motuzas reported "recurrence of depression and passive suicidality."  Id. at 1671. Motuzas continued reporting significant symptoms of depression and anxiety through the end of the available records of her course of therapy with Social Worker Mahoney.  Id. at 1674-1756.

Nurse Shipley wrote a letter on Motuzas's behalf on August 21, 2017.  Id. at 1382.  In that letter, Nurse Shipley opined that "[a]t this point," Motuzas was "limited with what she can do in regards to work.  Due to her mental health and her mobility issues with pain she is restricted with what she could do in the work force currently."  Id.

On February 13, 2019, Social Worker Mahoney filled out a third "Mental Impairment — Medical Source Statement" form provided to her by Motuzas's counsel.  Id. at 1416-19.  On this occasion, Social Worker Mahoney indicated that Motuzas suffered from depression and post-traumatic stress disorder.  Id. at 1416. Social Worker Mahoney opined that Motuzas was limited "most of the time on a sustained basis" in tolerating stresses common to a work setting, accepting instruction and responding to criticism, completing a normal work day or week without interruptions due to psychological symptoms, and performing at a consistent pace.  Id. at 1418.  She further opined that Motuzas was limited "a third or more of the time" in completing activities of daily living, maintaining social functioning, concentration, and task completion.  Id.

Nurse Shipley filled out a "Mental Impairment — Medical Source Statement" form on February 18, 2019.  Id. at 1406-09.  Through the form, Nurse Shipley opined that Motuzas suffered from depression and anxiety.  Id. at 1406.  Nurse Shipley opined that Motuzas was limited "most of the time on a sustained basis" in tolerating stresses common to a work setting and performing at a consistent pace. Id. at 1408.  She further opined that Motuzas was limited "a third or more of the

time" in completing activities of daily living, maintaining social functioning, maintaining attendance and schedule, adapting to changes in a work setting, and completing a normal work day or week without interruptions due to psychological symptoms.  Id.  She indicated that Motuzas was likely to be absent from work more than four days per month.  Id. at 1409.

Also on February 18, 2019, Nurse Shipley filled out a second "Physical Medical Source Statement" on Motuzas's behalf.  Id. at 1411-15.  Her opinion as expressed through this form was substantially similar to that expressed through the form she filled out on March 3, 2016.  Id.

On March 4, 2019, Dr. Rahman filled out a third "Physical Medical Source Statement" form.  Id. at 1400-04.  Through the form, Dr. Rahman opined that Motuzas suffered from chronic migraines, and indicated that her prognosis was "guarded."  Id. at 1400.  Dr. Rahman struck through and did not fill out those portions of the form which related to functional physical limitations.  Id. at 1401-03. Dr. Rahman stated in response to a question requesting a description of "other limitations . . . that would affect [Motuzas]'s ability to work" that she was "diagnosed to have chronic migraines.  Which are disabling."  Id. at 1403.

Having provided a brief summary of the material medical records, the court now turns to Motuzas's assignments of error in the ALJ's decision.  As noted, Motuzas argues that the ALJ erred in failing to find that her impairments met or equaled those set forth at Listing 11.04 and in weighing the medical opinions in the record.

II.    The ALJ's Analysis of <u>Listing 11.04 Does Not Constitute Grounds for Disturbing the Commissioner's Decision</u>

A DIB claimant is considered disabled for purposes of the Act if her impairments meet or equal the criteria of the conditions listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. <u>See</u> 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526. "[I]t is the claimant's burden to show that [s]he has an impairment or impairments which meets or equal" a one of the listed conditions (each, a "Listing"). <u>Torres v. Sec'y of Health & Human Servs.</u>, 870 F.2d 742, 745 (1st Cir. 1989). In order to sustain that burden, the claimant "must present medical findings equal in severity to all the [required] criteria" for the Listing at issue. <u>Sullivan v. Zebley,</u> 493 U.S. 521, 531 (1990) (emphasis in original) (superseded by statute on other grounds).

Listing 11.04 addresses vascular insult to the brain. There are three discrete sets of criteria for determining whether a claimant meets or equals Listing 11.04; a claimant need only meet one of the three sets in order to meet her burden at the third step of the five-step sequential process. <u>See</u> 20 C.F.R., Part 404, Subpart P, Appendix 1, § 11.04. Here, the ALJ considered the criteria set forth at Listing 11.04A and 11.04B but did not expressly address the independent criteria set forth at Listing 11.04C.

To establish disability under Listing 11.04C, a claimant must show that her impairments meet or equal the following criteria:

> Marked limitation . . . in physical functioning . . . and in one of the following areas of mental functioning, both persisting for at least 3 consecutive months after the insult:

    1.      Understanding, remembering, or applying information . . . ; or

    2.      Interacting with others . . . ; or

    3.      Concentrating, persisting, or maintaining pace . . . ; or

    4.      Adapting or managing oneself . . . .

20 C.F.R., Part 404, Subpart P, Appendix 1, § 11.04C.

Motuzas notes, correctly, that the ALJ did not expressly address Listing 11.04C. However, the ALJ discussed Listing 12.04 (depressive, bipolar, and related disorders) at length, including the criteria set forth at Listing 12.04B.[3] Admin. Rec. at 37-38. Listing 12.04B addresses precisely the same four areas of mental functioning as Listing 11.04C, and differs from Listing 11.04C only in that it requires "extreme" limitation in one or "marked" limitation in two of the areas, whereas Listing 11.04C requires "marked" limitation in only one of the four areas. See 20 C.F.R., Part 404, Subpart P, Appendix 1, §§ 11.04C, 12.04B. The ALJ expressly found, based on medical evidence of record, that Motuzas had no more than "mild" limitations in understanding, remembering, or applying information, in interacting with others, and in adapting or managing herself, and no more than "moderate" limitation in concentrating, persisting, or maintaining pace. Admin. Rec. at 37-38. These findings preclude the possibility that, had the ALJ included express discussion of Listing 11.04C in his opinion, he would have found that Motuzas's impairments satisfied the requirements of Listing 11.04.

---

[3] Motuzas does not argue that the ALJ erred in his assessment of the Listing 12.04B criteria.

The fact that Motuzas had suffered a stroke (i.e., a vascular insult to the brain) was properly before the ALJ; consequently the ALJ should have considered all of the criteria of Listing 11.04.  However, the ALJ's failure to consider the criteria of Listing 11.04C was necessarily harmless under the circumstances.  See Shinseki v. Sanders, 556 U.S. 396, 409-11 (2009).  Where correction of an ALJ's error could not change the outcome of a case, the error cannot have prejudiced the claimant and remand is not mandated.  See, e.g., Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 656 (1st Cir. 2000); Van Ngo v. Saul, 411 F. Supp. 3d 134, 145 (D. Mass. 2019).  Here, the ALJ's failure to consider the criteria of Listing 11.04C could not have been prejudicial in light of his express findings regarding Listing 12.04B.  See, e.g., Newman v. Saul, 474 F. Supp. 3d 345, 356 (D. Mass. 2020); Coppola v. Colvin, No. 12-CV-492-JL, 2014 WL 677138, at *3-4 (D.N.H. Feb. 21, 2014).  Reversal or remand is therefore unwarranted based on the ALJ's failure to address Listing 11.04C.  See Ward, 211 F.3d at 656.

III.   The ALJ Improperly Weighed Some of the Medical Opinions of Record

"An ALJ is required to consider opinions along with all other relevant evidence in a claimant's record."  Ledoux v. Acting Comm'r, Soc. Sec. Admin., Case No. 17-cv-707-JD, 2018 WL 2932732, at *4 (D.N.H. June 12, 2018).  "Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do

despite impairment(s), and [the claimant's] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1).

The ALJ analyzes the opinions of state agency consultants, examining sources, and treating sources under the same rubric. See id.; 20 C.F.R. § 404.1527(c). The ALJ must consider "the examining relationship, treatment relationship (including length of the treatment relationship, frequency of examination, and nature and extent of the treatment relationship), supportability of the opinion by evidence in the record, [and] consistency with the medical opinions of other physicians," along with the doctor's expertise in the area and any other relevant factors. Johnson v. Berryhill, Case No. 16-cv-375-PB, 2017 WL 4564727, at *5 (D.N.H. Oct. 12, 2017).

Here, Motuzas argues that the ALJ erred in according greater weight to the opinions of agency consulting physician Standell and agency consulting psychologist Stenslie than to those of treating neurologist Rahman, examining psychologist Friedrich, treating nurse Shipley, and treating social worker Mahoney.

A.   Agency Consulting Physician Dr. Standell and Consulting Psychologist Dr. Stenslie

Motuzas's primary argument that the ALJ erred in giving substantial weight to the opinions of agency consulting physician Standell and agency consulting psychologist Stenslie is that the medical records available to them were "significantly incomplete" when they conducted their reviews on December 23, 2015. The court agrees with Motuzas that "an opinion from a state-agency consultant

cannot provide substantial evidence to support an ALJ's finding if the consultant's opinion is based on a record that is 'significantly incomplete.'" Gorman v. Saul, No. 18-CV-889-LM, 2020 WL 502938, at *3 (D.N.H. Jan. 31, 2020) (quoting Alcantara v. Astrue, 257 Fed. Appx. 333, 334-35 (1st Cir. Dec. 12, 2007)). "The record is significantly incomplete if later evidence shows a material change in the claimant's limitations," and it is the ALJ's burden to determine and explain whether missing evidence is material. Id. (citing Giandomenico v. Soc. Sec. Admin., No. 16-CV-506-PB, 2017 WL 5484657, at *4 (D.N.H. Nov. 15, 2017)). "'It is insufficient for the ALJ to simply state that the record was not materially changed. Instead, the ALJ must make the absence of change adequately clear.'" Id. (citing Blakely v. Saul, No. 18-CV-702-LM, 2019 WL 4668020, at *5 (D.N.H. Sept. 25, 2019)).

Here, the ALJ opined that "[a]lthough additional treatment notes were admitted to the record after the[ state-agency consultants'] opinions were rendered, these additional treatment notes do not document any meaningful change or deterioration in the claimant's presentation and the[ state-agency consultants'] opinions remain consistent with the evidence of record in its entirety." Admin. Rec. at 48. The court has previously found this precise statement to be inadequate to carry this ALJ's "burden to provide useful analysis" as to why a state-agency consultant's opinion is entitled to significant weight notwithstanding that the consultant reviewed incomplete medical records. Gorman, 2020 WL 502938 at *3.

Moreover, although the ALJ discussed many of the opinions contained in the later-added records in addition to offering his conclusory statement, he made no

serious effort to explain why the new materials did not reflect any material change in Motuzas's limitations.  Id. at 43-48.  In particular, the court notes that Dr. Stenslie's opinion that Motuzas suffered from only "occasional" migraines is difficult to reconcile with the later-added records.  Indeed, the court observes that the medical records Dr. Stenslie reviewed included indications that the frequency and intensity of Motuzas's migraine headaches had greatly reduced in the spring of 2015, such that they might reasonably have been characterized as occasional and mild during that period, Admin. Rec. 716, 1174.  However, the later-added materials included reports of a three-day migraine in late September 2015 of such intensity as to require an emergency room visit notwithstanding an unsuccessful occipital nerve-block procedure, id. at 1172-73, as well as migraines lasting for two weeks in late September and early October 2015, id. at 1815.  Absent meaningful discussion of these and other records and the degree to which they are consistent with the records available to the state-agency consultants, the ALJ necessarily erred in according substantial weight to the consultants' opinions.  See Gorman, 2020 WL 502938 at *3; Alcantara, 257 Fed. Appx. at 334-35.


      B.      Treating Neurologist Dr. Rahman

The ALJ accorded little weight to Dr. Rahman's medical opinions of March 21 and December 19, 2016 on the stated ground that they are not supported by

objective evidence, including Dr. Rahman's own findings and treatment notes.[4]
Admin. Rec. at 45-47.  Specifically, the ALJ rejected Dr. Rahman's opinions that
Motuzas had significant exertional and postural limitations and would need to be
absent from work more than four days per month.  Id.

   "[T]reating physicians' opinions are ordinarily accorded deference in Social
Security disability proceeding."  Richards v. Hewlett–Packard Corp., 592 F.3d 232,
240 n. 9 (1st Cir. 2010).  This is because "these sources are likely to be the medical
professionals most able to provide a detailed, longitudinal picture of [the claimant's]
medical impairment(s) and may bring a unique perspective to the medical evidence
that cannot be obtained from the objective medical findings alone or from reports of
individual examinations, such as consultative examinations or brief
hospitalizations."  20 C.F.R. § 416.927(c)(2).  A treating-source opinion is entitled to
controlling weight if it is "well-supported by medically acceptable clinical and
laboratory diagnostic techniques and is not inconsistent with the other substantial
evidence in [the claimant's] case record."  20 C.F.R. § 416.927(c)(2).  If, however, the
treating-source opinion conflicts with other opinions in the record, the ALJ "may
reject the opinion of the treating physician so long as an explanation is provided
and the contrary finding is supported by substantial evidence."  Tetreault v. Astrue,

---

   [4]  The ALJ appropriately afforded no weight to Dr. Rahman's opinion of
March 4, 2019 that Motuzas "is diagnosed to have chronic migraines[] [w]hich are
disabling," correctly noting that the opinion was offered as to a matter reserved to
the Commissioner.  Admin. Rec. at 47; see also 20 C.F.R. § 404.1527(d)(1).

865 F. Supp. 2d 116, 125 (D. Mass. 2012) (internal quotation marks, citation omitted).[5]

Here, as noted, the ALJ declined to accord deference to Dr. Rahman's opinions of March 21 and December 19, 2016 on the ground that the opinions were not supported by Dr. Rahman's own clinical findings or by other objective medical evidence of record.  However, also as noted, the medical record is replete with diagnoses, clinical findings, and observations by treating and examining medical sources that Motuzas was at all material times severely obese, including Dr. Rahman's own repeated observations that Motuzas's BMI was significantly in excess of 40.  See, e.g., Admin. Rec. at 606-08, 1100, 1174, 1178, 1822.  Moreover, effective as of May 20, 2019,[6] the Administration superseded its previous Policy Interpretation Ruling governing the evaluation of cases involving obesity with Social Security Ruling 19-2p.  Pursuant to the superseding Policy Interpretation Ruling, the Administration acknowledges that obesity can be a contributing cause of limitations in any of the "exertional functions" of "sitting, standing, walking, lifting, carrying, pushing, and pulling," or the "nonexertional functions" of "climbing, balancing, stooping, kneeling, crouching, and crawling."  S.S.R. No. 19-2p.

---

[5] An ALJ must give "good reasons" for rejecting a treating source's opinion. 20 C.F.R. § 416.927(c)(2); see also Polanco–Quinones v. Astrue, 477 Fed. Appx. 745, 746 (1st Cir. 2012) (unpublished disposition).  Reasons are "good" for this purpose if they are specific, supportable, and provide a rationale that a reasonable mind could accept.  See Dimambro v. U.S. Soc. Sec. Admin., Case No. 16-cv-486-PB, 2018 WL 301090, *10 (D.N.H. Jan. 5, 2018).

[6] By its terms, S.S.R. No. 19-2p applies to claims "pending on and after" May 20, 2019.  The ALJ issued his opinion denying Motuzas's claim on September 26, 2019.

Although the ALJ made occasional references to Motuzas's obesity, and provided the purely conclusory statement that "[t]he claimant's limitations due to obesity are reflected in below [*sic*] residual functional capacity," Admin. Rec. at 35, his opinion contains no analysis of whether Dr. Rahman's assessment of Motuzas's exertional and postural limitations might have been supported by the clinical finding that Motuzas was severely obese.  This is insufficient to meet the ALJ's burden to provide good reasons for concluding that a treating medical source's opinion lacks support in the clinical findings of record.  See 20 C.F.R. § 416.927(c)(2); see also, e.g., Janet F. v. Saul, No. 4:19CV61, 2020 WL 1443783, at *11 (N.D. Ind. Mar. 23, 2020); Hurt v. Comm'r of Soc. Sec., No. CV 19-18627, 2021 WL 754031, at *7 (D.N.J. Feb. 26, 2021).

Similarly, the ALJ erred in rejecting Dr. Rahman's opinion that Motuzas would likely be absent from work more than four days per month.  That opinion is supported by Dr. Rahman's contemporaneously maintained treatment notes indicating that Motuzas suffered from debilitating migraine headaches one or two times per week and lasting for whole days.  Admin. Rec. at 1168, 1193-95. Moreover, the only inconsistent evidence of record that the ALJ referenced in his opinion was Dr. Stenslie's opinion that Motuzas suffered only from "occasional" migraines, id. at 45-47; as noted above, the ALJ was not entitled to treat Dr. Stenslie's opinion as substantial evidence.  This, too, is insufficient to meet the ALJ's burden.  See 20 C.F.R. § 416.927(c)(2).

For these reasons, the ALJ erred in failing to accord Dr. Rahman's opinion the deference to which a well-supported treating physician's opinion is entitled.

C.     Examining Psychologist Dr. Friedrich

The ALJ accorded little weight to Dr. Friedrich's opinions of January 22, 2014 and November 16, 2015 on the stated ground that Dr. Stenslie found her conclusions to be poorly supported by her own clinical findings.  Admin. Rec. at 47. Specifically, Dr. Stenslie took issue with Dr. Friedrich's conclusion that Motuzas was "unable to maintain concentration and complete tasks" because that conclusion was based solely on Motuzas's inability to "go beyond the first in serial sevens."  Id. at 124, 1140, 1826.  The ALJ adopted Dr. Stenslie's reasoning in rejecting Dr. Friedrich's opinion.  Id. at 47.

The opinion of a consultative examining psychologist must be assessed in light of the absence of a treating relationship between the examiner and the claimant, the support given for the opinion by the examiner, the consistency of the opinion with the record as a whole, and the examiner's relevant expertise.  See 20 C.F.R. § 404.1527(c)(2)-(6).  The ALJ must give "good reasons" for rejecting the opinion of any acceptable medical source, including that of a consultative examining psychologist.  See 20 C.F.R. § 404.1527(c)(2).  Here, for the reasons discussed above, the ALJ was not entitled to treat Dr. Stenslie's opinion as substantial evidence. Accordingly, the court finds that the ALJ did not meet his burden to provide good reasons for rejecting Dr. Friedrich's opinion.

D.    <u>Treating Nurse Shipley and Treating Social Worker Mahoney</u>

The ALJ accorded little weight to Nurse Shipley's opinions of March 3, 2016 and February 18, 2019 on the stated ground that Nurse Shipley's opinions as expressed through the attorney-provided forms are inconsistent with her own treatment notes.  Admin. Rec. at 45.  Specifically, the ALJ found that there was no objective medical support for Nurse Shipley's opinions regarding Motuzas's exertional and postural limitations, "off task" time, and need for frequent absences from work."  <u>Id.</u> at 44-45.  In addition, the ALJ found that these opinions were inconsistent with Nurse Shipley's frequent "normal" physical examination findings and with her observation of improvement in Motuzas's symptoms in September 2016.  <u>Id.</u>

The ALJ also accorded little weight to Social Worker Mahoney's opinions of August 6, 2015, December 22, 2016, and February 13, 2019.  <u>Id.</u> at 43-44.  As to the opinion of August 6, 2015, the ALJ noted that Social Worker Mahoney's opinion that Motuzas was "unable to work because of physical condition, not because of mental health reasons" was outside the area of her expertise as a mental health therapist.  <u>Id.</u> at 43.  As to the opinion of December 22, 2016, the ALJ found that Social Worker Mahoney's opinion as to Motuzas's functional limitations was inconsistent with her therapy notes indicating that Motuzas's depression and anxiety were related to her life circumstances and with her finding of March 3, 2017, that Motuzas's therapy goals were achieved.  <u>Id.</u> at 43-44.  And as to the

32

opinion of February 13, 2019, the ALJ found that the indicated limitations were inconsistent with Social Worker Mahoney's own therapy notes.  Id. at 44.

As respectively a registered nurse and a licensed clinical social worker, neither Nurse Shipley nor Social Worker Mahoney is considered an "acceptable medical source" for purposes of establishing the existence of a medically determinable impairment.  See S.S.R. No. 06-03p.  However, in addition to evidence from acceptable medical sources, an ALJ may also consider evidence from other sources to show the severity of a claimant's impairments.  20 C.F.R. § 404.1527(d). Moreover, Social Security Ruling 06-03p (which although rescinded by Federal Register Notice Vol. 82, No. 57, page 15263, remains applicable to claims, like Motuzas's, filed before March 27, 2017) provides, in relevant part:

> Since there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical sources who are not "acceptable medical sources" and from "non-medical sources" who have seen the claimant in their professional capacity.  Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

S.S.R. No. 06-03p.  20 C.F.R. § 404.1527(f)(2) further explains as follows:

> The adjudicator generally should explain the weight given to opinions from [medical sources who are not acceptable medical sources] or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to

follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

20 C.F.R. § 404.1527(f)(2).

Pursuant to S.S.R. No. 06-03p and Section 404.1527(f)(2), it would have been error for the ALJ to ignore Nurse Shipley and Social Worker Mahoney's opinions. See Alcantara, 257 Fed. Appx. at 334-35. However, the ALJ did not ignore Nurse Shipley's or Social Worker Mahoney's opinions, but rather discussed them at length, described the weight he afforded to each, and explained why. Admin. Rec. at 43-44. Neither Social Security Ruling 06-03p nor Section 404.1527(f)(2) requires more. See Tucker v. Berryhill, No. 2:16-CV-00301-JHR, 2017 WL 2539750, at *6 (D. Me. June 11, 2017). Accordingly, the ALJ did not err in the weight he afforded the opinions of Nurse Shipley and Social Worker Mahoney.

IV.   Vacatur of the Commissioner's Decision and Remand for Further Proceedings is Warranted

As discussed above, the ALJ erred in his reliance on the opinions of state-agency consultants Dr. Sandell and Dr. Stenslie, in failing to accord deference to the opinion of treating neurologist Dr. Rahman, and in rejecting a portion of the opinion of examining psychologist Dr. Friedrich. However, the court cannot find on the record before it that Motuzas is clearly entitled to award of benefits. Accordingly, the appropriate remedy is vacatur of the Commissioner's decision and remand for further proceedings consistent with this court's opinion and with all applicable regulations. See Seavey v. Barnhart, 276 F.3d 1, 11 (1st Cir. 2001).

**CONCLUSION**

For the foregoing reasons, Motuzas's motion to reverse (doc. no. 9) is granted, and the Commissioner's motion to affirm (doc. no. 12) is denied. The court vacates the Commissioner's decision and remands this case to the Administration for further consideration. The clerk of the court shall enter judgment in accordance with this order and close the case.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

August 25, 2021

cc:  Counsel of Record